Filed 4/14/21  P. v. Shin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>EDWARD YOUNGHOON SHIN,<br><br>　　Defendant and Appellant. | G058082<br><br>(Super. Ct. No. 11CF2363)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Steve Oetting and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

Edward Younghoon Shin appeals from a judgment after a jury convicted him of murder for financial gain. Shin argues the following: the trial court erred by admitting evidence; the prosecutor committed misconduct, or alternatively, his trial counsel was ineffective; there was cumulative error; the court erred by denying his motion for a continuance; and the court erred by denying his motion for new trial. None of his contentions have merit, and we affirm the judgment.

FACTS

There is no dispute Shin caused Chris Smith's (Chris)[1] death in their office and Shin orchestrated an elaborate cover-up to convince Chris's family and friends he sold his share of the company to Shin and was traveling the world with a Playboy Playmate. The issue at trial was whether Shin intended to kill Chris or acted in self-defense.

An information charged Shin with murder for financial gain (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(1)). Before trial, the prosecution sought to introduce numerous e-mails Chris sent his attorney. The trial court admitted some of the e-mails and excluded others. We will discuss the e-mails in greater detail below.

I. Prosecution Case

A. Shin & Chris Meet

Around 2006, Chris relocated from Northern California, where he grew up with his younger brother Paul Smith (Paul), to Southern California. Chris started working for Leadpoint, a lead generation company. A lead generation company provides advertisements to television networks or radio stations to generate consumer responses. The consumer who responds to the commercial is the "lead," and the company that responds to the customer's need is the buyer.

_____

[1] Because several parties have the same surname, we will refer to them by their first names to avoid confusion.

2

In 2008, Shin started working for Lead Generation Technologies (LGT) to manage a new category of advertising leads related to real estate mortgages. Shin had access to the leads and the revenue generated from the leads. Shin worked with Jennifer Matthews-Osborne of RevShare, which was owned by the same person who owned LGT. LGT sold leads through Leadpoint. Shin and Chris met during this time. At some point, Chris left Leadpoint and began working for LGT.

B. *Shin & Chris form a Business*

In 2009, Shin and Chris left LGT to start their own lead generation company called The 800 Exchange, LLC (800 Exchange). They hired the following people: Paul, who moved his wife and two daughters from Oregon to Orange County; Matthews-Osborne; Adam Pestritto; Jaslin Levy; an assistant; and a receptionist. The employees worked remotely until 800 Exchange opened an office in San Juan Capistrano. The office space included several offices, a conference room, a break room, and a reception area. Chris worked in the southeast office. Coworkers described Chris as quirky, happy, friendly, even-tempered, positive, and professional. None of them had seen Chris intoxicated.

Shin focused on managing the company, including its finances. He was in the office during normal business hours. Chris focused on the company's creative side, while also developing a software program for a new company named S2. He came in later in the day or worked at night or from home. Shin, Chris, and Matthews-Osborne took several trips to Las Vegas where they stayed in a nice hotel. Shin gambled thousands of dollars, but Chris did not gamble.

According to Levy, an accountant, in June 2010, 800 Exchange's monthly expenses were $1,500 for office rent, $1,000 for utilities, $40,000 for employee salaries, and $200,000 for advertising costs. Its estimated monthly gross income was between $500,000 to $1,000,000.

3

## C. LGT Sues Shin & Chris

After Shin left LGT, it noticed financial irregularities and performed an audit. LGT discovered about $750,000 to $900,000 and information related to prospective leads was missing. LGT filed a lawsuit against Shin, Chris, and 800 Exchange. The lawsuit caused tension between Shin and Chris. Additionally, Leadpoint sued Chris for misappropriating proprietary interests. Chris was drinking alcohol heavily, taking sleeping medication, and contemplated suicide.

Chris hired attorney Ernesto Aldover to represent him in the LGT lawsuit and other matters related to companies he owned with Shin. In May 2010, the parties were close to settling the LGT lawsuit. The settlement required Shin to pay LGT about $700,000 within five months or serve 16 months in prison and Chris would be dismissed as a party. As the parties finalized the settlement, Chris told Aldover and Paul that he was afraid Shin might take some of their companies' assets. Chris asked Aldover to secure his interests and make sure Shin could not remove money from their companies. Chris wanted to use the settlement as leverage to secure his interests. Chris requested the following protections, which he included in e-mails to Aldover: all bank accounts and any check or wire in excess of $10,000 would require both of their signatures; preparation of regular, third-party reports for each company they owned together; changes to the bylaws would require 66 percent of the vote; and Chris's share of revenue could not be used to pay the settlement.

## D. Friday, June 4, 2010

On the evening of June 3, 2010, and into the next day, Chris and Aldover negotiated with Shin and his attorney, Jeb Dykstra. The parties exchanged e-mails until about 1:00 a.m. When Aldover returned to the office later that morning, Dykstra sent him an e-mail stating Chris forwarded what they worked on the night before to Shin and they agreed to the terms. However, Chris told Aldover there was one unresolved issue—passwords on some of the bank accounts had been changed, and he did not know how

4

much money were in the accounts. Chris told Aldover that he wanted to meet with Shin to see the accounts. That was the last time Aldover communicated with Chris.

At 6:01 p.m. that evening, Aldover received an e-mail from Chris's e-mail address stating Shin was going to purchase his interest in 800 Exchange for $30,000 and 10 gold coins; Chris retained his interest in S2. Aldover thought it was strange because of all the work they had done to negotiate agreements with Shin and LGT. Aldover later received documentation that Chris signed selling his interest to Shin. Aldover continued to represent Chris in Leadpoint's lawsuit against him.

*E. Shin Closes 800 Exchange for One Week*

On Saturday, June 5, 2010, Shin sent an e-mail to 800 Exchange employees telling them to not come to work the following week. Shin stated he and Chris would be reviewing business plans and did not want to be disturbed. Levy picked up her laptop computer from Shin's house early that week; Shin had no visible injuries.

On Wednesday, June 9, 2010, Shin rented a Dodge Ram truck in San Juan Capistrano. His cellular telephone records showed he was in Laguna Beach near Chris's apartment between 1:15 p.m. and 3:49 p.m. that day. The records from that day also showed Shin traveled from north San Diego County at 10:53 p.m. to just north of the Mexican border the next morning at 12:50 a.m. and spent the next hour, until 1:50 a.m., in a desolate area.

Paul and his family returned from a vacation on Wednesday, June 9, 2010. Chris did not pick them up at the airport as they had arranged. Paul went to the office on Thursday or Friday. He saw Pestritto and Shin, who did not have any visible injuries. Paul saw fans throughout the office, which smelled terrible, and a large stain outside of Chris's office door. Paul noticed Chris's office furniture was gone. Shin told Paul that he purchased Chris's interest in the company and Chris was in the Galapagos Islands with a woman named Tiffany Taylor (Taylor). The LGT settlement documents were signed this week.

5

On Saturday, June 12, 2010, Shin sent an e-mail to the 800 Exchange employees telling them they could return to work on Tuesday, June 15, 2010. When Matthews-Osborne and Levy returned to the office, they noticed a disgusting odor and portions of the office had been repainted. They said the carpet was wet, like it had been cleaned, and there was a dark stain in front of Chris's office. Levy and Pestritto saw Chris's desk was chipped and damaged on the left side.

Chris was not in the office when the employees returned. Neither Matthews-Osborne nor Levy noticed Shin had any visible injuries. Shin said he and Chris came to an agreement about the company and Chris was traveling. Shin and Pestritto said Chris had been intoxicated and urinated on the walls. Shin gave Matthews-Osborne a $10,000 bonus, Levy a $12,500 bonus, and Pestritto a $15,000 bonus.

Shin was now the sole owner of 800 Exchange, which quickly moved locations. 800 Exchange's bank statements for May 27, 2010, through June 28, 2010, showed several unidentified wire transfers to another bank account that Levy could not reconcile. Shin paid LGT the required restitution payments. After June 4, 2010, business declined, and Shin took a job at another company. 800 Exchange dissolved in March 2011.

*F. E-mails from Chris's E-mail Address*

Family and friends received e-mails purporting to be from Chris after June 4, 2010. On Tuesday, June 8, 2010, Erika Kloumann, Chris's girlfriend received an e-mail stating, "'I don't love you anymore. I met a stripper in Vegas. I'm leaving to go to the Galapagos Islands with her.'"

Steve Smith (Steve), Chris's father, stated the e-mails began sounding exciting because Chris was taking a leave of absence from work and was going on vacation. Soon, however, the e-mails were a "roller coaster" because Chris was depressed and suicidal and then excited and happy. Chris e-mailed Paul and said he was on a boat in the Galapagos Islands with Taylor and included a picture of her. Subsequent

6

e-mails placed Chris all over the world.  Paul did not think this was unusual because Chris was an avid surfer and often spoke of traveling the world and surfing.

Aldover received an e-mail stating Chris was going on vacation and would be unavailable for several weeks.  Aldover, however, continued to e-mail Chris concerning the Leadpoint lawsuit.  Aldover received responses that included language that did not sound like Chris.  Aldover eventually became concerned the person he was communicating with via e-mail was not Chris.  The e-mails said Chris did not want to return to face the Leadpoint lawsuit, which Aldover thought was unusual because Chris initially expressed a strong desire to fight the lawsuit.  Aldover called Paul to get more information about Chris and the State Bar of California Ethics Hotline to determine what information he could reveal if he ultimately decided to contact the police.  The e-mails stopped in December 2010.

G.  *Kenny Kraft*

Sometime in June, after Chris was gone, Shin hired Kenny Kraft to be his personal assistant.  Shin gave Kraft the keys to Chris's apartment in Laguna Beach and Chris's Range Rover and said he could live in the apartment and drive the vehicle because the company paid for them.  Shin told Kraft to dispose of the apartment's contents.  After Kraft moved into the apartment, he donated the male clothing and gave two surfboards to his friends.  A couple months later, Shin told Kraft to dispose of the Range Rover—he gave it to a friend but told him it would be repossessed.  Kraft went on several luxurious trips to Las Vegas with Shin, Matthews-Osborne, and Pestritto.  Shin played blackjack and craps, gambling more than $10,000 for hours at a time.

H.  *Chris's Relatives became Suspicious*

In Fall 2010, Shin hired Taylor, a Playboy Playmate whose real name was Summer Hanson, to host an 800 Exchange event in Las Vegas.  At a dinner, Paul saw Taylor and recognized her from a photograph in one of Chris's e-mails as the person he was traveling with.  Paul asked Taylor whether she was the person who went with Chris

7

to the Galapagos Islands. Taylor said she did not know Chris and had never been there. Paul looked at Shin and saw him shake his head indicating it was not the same person. Sometime later, Paul quit 800 Exchange.

At some point, Paul drove by Chris's apartment in Laguna Beach and saw his Range Rover parked in his stall. Paul thought it was strange because it should have been at the airport. Paul sent Chris an e-mail, and Chris responded, "'That's impossible,'" and said it was at the airport and not to worry about it.

In December 2010, Steve became suspicious when Chris's e-mails stopped. He contacted his Senator's office and the State Department, which confirmed Chris had never left the country.

In March 2011, Steve drove to Orange County and met with Shin at his new office to talk to him about what happened in June 2010 and Chris's whereabouts. Shin told Steve that Chris was intoxicated on sleeping medication and wine, and urinated, vomited, and spilled wine all over the walls in their old office. Shin said he closed the office for one week to have it professionally cleaned. He told Steve that he bought Chris's interest in 800 Exchange for $1.2 million, which he wired to an account in the Cayman Islands. Shin told Steve that before Chris left, they went to Los Angeles so Chris could get a fake passport from a tattooed Armenian or Persian man. He added Johnny Kaponen "Vegas" introduced him to that man. Shin said he would try to locate Kaponen through Tom Ramey, who was on a sabbatical in Hawaii. He gave Ramey's telephone number to Steve. When Steve contacted Ramey, he denied knowing much about what had happened.

I. *The Investigation*

In April 2011, 10 months after Chris was last seen, Steve filed a missing person report with the Laguna Beach Police Department (LBPD). An LBPD sergeant called the Department of Homeland Security and confirmed Chris did not use his passport to leave the United States. He also determined Chris had not left his car at the

8

airport. He discovered Chris had not used his bank account in at least nine months and had not paid his rent or utilities.

In July 2011, the Orange County Sheriff's Department (OCSD) assumed responsibility for the case. An OCSD sergeant went to 800 Exchange's former office, saw what appeared to be blood, and had the crime lab process the office. The forensic team found blood throughout the office. The team tested the blood and seven samples belonged to a single male with the same genetic profile. The forensic team also examined Chris's Range Rover and found blood in the rear cargo area. This blood matched the same genetic profile found on the blood samples from the office. OCSD investigators recovered Chris's office furniture, floor mat, white board, and computer monitor. The forensic team recovered blood from the desk surface, one of the office chairs, and the back of the computer monitor, all of which were determined to match the same genetic profile as the blood found in the office. The forensic team compared the DNA profile from the evidence found in the office, in the Range Rover, and on the furniture to Chris's parents' DNA and determined his parents could not be excluded as being the biological parents of the person in the DNA profile. None of the blood samples recovered from the office, Range Rover, or furniture contained any DNA consistent with Shin's profile.

The OCSD sergeant recovered Shin's iPad. The OCSD computer forensics specialist found e-mails purporting to be from Chris on the iPad that were sent from an e-mail address created on December 17, 2010, using an internet provider address from the same company as Shin's internet service provider. The iPad included at least one additional e-mail account that was associated with Chris. Chris's family never received any of his assets from his companies with Shin.

9

## II. Defense Case

### A. Shin

Shin testified concerning his experience at LGT, how he met Chris at Leadpoint, and their friendship. Shin stated that while Chris was still at Leadpoint, he told Shin that based on Leadpoint's records, LGT was underpaying him. Chris told Shin that he could access Leadpoint's system though a "'back door'" and reroute money that should go to LGT to a third company he would create. Shin created "LP Services," rerouted $600,000 of LGT money into the account, and wired $33,000 to Chris. Shin admitted he pleaded guilty to fraud and agreed to repay LGT $700,000 as part of the LGT settlement within five months. Shin paid about $120,000 from another account at that time and had to pay the balance within five months or risk going to prison. Shin stated he did not implicate Chris because he had nothing to do with the amount Shin took.

Shin explained how he and Chris formed 800 Exchange. Shin handled the business side and Chris handled the creative side. Shin and Chris each earned $15,000 per month and each would take profit distributions of up to $20,000 every six weeks or less. Both Shin and Chris were signatories on 800 Exchange's bank account. Shin and Chris were also building S2, a software product they believed was the future of the business. Shin stated his arrest and the LGT lawsuit caused Chris to become erratic and judgmental, and it caused conflict in their relationship. They were both stressed, and they frequently argued. They occasionally communicated over Skype messenger and he saved screen shots of their conversations because Chris's behavior was odd.

Shin stated that during early June 2010, he and Chris discussed reorganizing 800 Exchange and S2, and settling the LGT lawsuit. Shin said he agreed to Chris's demands for increased ownership of 800 Exchange and tightening control of its finances.

Shin testified that between 2:00 p.m. and 5:00 p.m. on June 4, 2010, he went to Chris's office to talk to him about his demands for the company. After they

10

discussed an existing client matter, Chris began discussing the LGT lawsuit. Chris said he wanted to make sure nothing like that happened again and repeated Shin could not use company money to pay the restitution amount. Shin expressed his irritation with the filthiness of Chris's office—Chris had been drinking wine and chewing tobacco. Shin discussed the Leadpoint lawsuit against Chris. He said that if he could not use company money to pay LGT restitution, Chris could not use company money to pay any Leadpoint settlement. Chris got very angry and said Shin was responsible for his legal troubles. Shin said he needed to clean his office and accept responsibility for his role in the lawsuits.

Chris stood up and took a couple steps towards Shin, like he wanted to fight. Shin stood up and tried to deescalate the situation. Chris grabbed Shin's throat and squeezed for a couple seconds. Shin grabbed his shirt and tried to push him away. Shin shoved Chris into a dry erase board, which cut him above his left eye, and pinned him against the wall.

After Shin backed away, Chris lunged at him. Shin used a chair to try to keep Chris away from him. Chris continued to lunge at him and tried to punch him. Shin felt like he had to fight back. Chris's first few punches missed before one grazed the side of his head. Shin landed a couple punches to Chris's head and body. They grappled with each other and Chris fell into his desk drawer. Shin backed away.

Chris got up, jumped on top of his desk, and looked like he was going to jump on Shin. As Chris jumped, Shin also jumped. They collided and fell to the ground. After they both got up, Chris lunged, but Shin avoided him. They moved into the common area where they continued to grapple with each other until they were out of breath.

Chris said, "[I]t's [fucking] over." Shin responded, "[I]t's over. I have the [fucking] proof, and you're going to have to pay too then." Chris lunged at Shin, and Shin grabbed him and threw him into a pile of water bottles in the breakroom. Chris got

11

up and lunged at him to try to tackle him. Shin sidestepped Chris, grabbed him, turned around, and swung him into his office as hard as he could. Shin did not see what happened, but he heard "a big thunk" and believed Chris hit his head on the side of his desk. Chris was on the ground unconscious in the fetal position. Shin did not check his pulse or call the paramedics; he stared at him in disbelief as the blood pooled underneath his head.

Shin went to the restroom to clean off the blood and sweat believing Chris was most likely dead. Fifteen to twenty minutes later, Shin returned and saw Chris in the same position with "a lot more blood" underneath his head. Shin was convinced Chris was dead. It had been about one hour since Chris hit his head. Shin did not call the police because he was in the middle of a criminal case and did not think anyone would believe what happened. Shin found Chris's wallet and cell phone, left the office, drove around for about 15 minutes, and returned to the office.

Shin testified that when he returned to the office he knew he had to develop a plan to explain Chris's death. Shin decided he would tell everyone they settled the lawsuit, he bought Chris's interest in the company, and Chris left on a sabbatical. Shin created paperwork to show Chris sold his interest in the company to Shin. Using Chris's e-mail account, Shin sent an e-mail to Aldover. Using Chris's cell phone, he sent instant messages to Paul and Kloumann stating he and Shin negotiated a settlement and they were going to Las Vegas to celebrate and get some assets.

At 7:28 p.m., Shin called Ramey to help him dispose of Chris's body. During a second call about one hour later, Ramey told Shin to call Kaponen. Shin went home around midnight. Around 10:00 a.m. the next morning, Shin called Kaponen from a burner cell phone he bought that morning and explained he needed "garbage disposal." Kaponen told Shin to get $10,000 or $15,000 and await further instructions. About one hour later, Shin went to the office and saw blood smears on the walls. A man called Shin and told him to meet the man at a gas station in Long Beach at 1:00 p.m., give him the

12

money and directions to the office, and leave the office unlocked.  Shin met the man, who said he would "'take care of it.'"

When Shin returned to the office the next day, Chris's body was gone, but there was still blood everywhere.  Shin bought cleaning supplies and tried to clean and paint the office.  Unsuccessful, he hired professional carpet cleaners and painters to work the week he closed the office.  When employees returned to work, he gave them bonuses in case anything happened to him.

Shin rented the truck because he wanted to flee to South America and thought he would need a truck with four-wheel drive and his Mercedes might be carjacked.  He drove to the Mexican border but decided he could not leave his family and drove back home.

Shin continued sending messages through December 2010 pretending to be Chris to maintain the appearances he was online while traveling.  He said he "was a nervous wreck," "distraught," and "sometimes suicidal."  He regretted sending the e-mails because it was cruel.  He admitted that when he was in his early 20s, he sent an e-mail to his parents pretending to be someone else and asking for ransom after one of his businesses started failing.  Shin stated the business failed primarily because Chris was not there.  He also regretted everything he did after the fight.  Shin testified he did not plan or intend to kill Chris.  He was defending himself.

The prosecutor's cross-examination of Shin was interrupted by the testimony of two witnesses, Kloumann and Pestritto, who were taken out of order.  After they testified, Shin resumed testifying.  We provide Shin's cross-examination testimony without noting the interruption.

On cross-examination, Shin repeated he did not intend to kill Chris but admitted Chris did not have a weapon.  Shin acknowledged he suffered no red marks, scratches, or bruising on his neck.  He could not explain his lack of injuries if Chris hit him hard as he claimed.  Shin agreed Chris's body was the best evidence to prove his

13

story true. Shin stated he went to Chris's apartment to take belongings to make it look like Chris went on vacation and not to take gold. Shin admitted his salary and profit distributions doubled with Chris gone.

Shin acknowledged he initially lied to investigators and told them Chris left to travel before saying he would tell the truth. He also acknowledged he told investigators he returned to the office about 6:00 or 7:00 p.m. Shin admitted he never told investigators Chris grabbed him by the throat. The prosecutor questioned Shin about discrepancies in his testimony versus what he told investigators vis-à-vis his timeline from the day of the killing to when he met the man in Long Beach. Shin admitted one of the company's clients accused him of credit card fraud of almost $400,000.

B. *Kloumann*

Kloumann testified she was shocked and upset by the e-mail stating Chris was ending their relationship and traveling the world with another woman. Days earlier Chris told her that he was going to Las Vegas that weekend. Kloumann stated she told investigators Chris was paranoid and believed in conspiracy theories. She said Chris was angry and stressed about the Leadpoint lawsuit, and at one point said he wanted to kill the person suing him and torture his family. She stated he had a bad temper and she had seen him break telephones, throw chairs, and knock things over. She said he drank alcohol to intoxication, used cocaine a few times, and sometimes used sleeping medication. She said he kept gold in his apartment.

On cross-examination, Kloumann testified she never saw Chris injure a living being, never saw him violent, never saw him in a physical fight, and never saw him threaten anyone. She explained Chris's comments about committing violence against the man and his family were venting, and she did not believe anyone was ever in danger. She never heard him threaten violence against Shin.

14

On redirect examination, Kloumann admitted Chris grabbed her arm a couple times when he was angry. On recross examination, she said him grabbing her arm was unimportant, and he never physically abused her or anyone else.

## C. Pestritto

Pestritto testified concerning the office's condition when he returned and the condition of Chris's office furniture. On cross-examination, Pestritto stated he and Shin were very good friends and after June 4, 2010, he did not notice he suffered any visible injuries or being sad, depressed, or suicidal. He did not hear Chris mention going to South America.

## III. Verdicts, Posttrial Motions & Sentencing

On December 7, 2018, after an 18-day trial, the jury deliberated for about two hours before convicting Shin of murder for financial gain. After the trial court granted several continuances, Shin filed a motion for new trial and a motion for another continuance. The court denied both motions. We will discuss both motions in greater detail below. The court sentenced Shin to prison for life without the possibility of parole.

DISCUSSION

## I. Admission of Evidence

Shin argues the trial court erred by admitting three e-mails Chris sent to Aldover. We disagree.

## A. Background

Before trial, the prosecution filed a motion to admit the following two categories of e-mails: (1) Chris's e-mails to Aldover up to and including June 4, 2010; and (2) Shin's e-mails after June 4, 2010. The prosecution argued the e-mails were admissible pursuant to Evidence Code section 1250 and for a non-hearsay purpose. Shin filed opposition arguing the e-mails were not authenticated and his state of mind, not Chris's, was at issue and there was no evidence he was aware of the substance of the e-mails.

15

At the hearing on the motion, the prosecutor argued the e-mails were relevant to prove Chris's death, and Shin's financial gain and motive, and to disprove self-defense. Shin's trial counsel contended the e-mails were not relevant because they were Chris's statements not Shin's and there was no evidence Shin knew about Chris's fears. Counsel added the statements were unduly prejudicial, untrustworthy, and testimonial. The prosecutor responded the e-mails were evidence Shin knew of Chris's fears based on his conversations with Chris and their attorneys' negotiations. The prosecutor added the e-mails were trustworthy because Chris's statements were made in the context of the attorney-client relationship.

In a detailed seven-page ruling, the trial court granted in part and denied in part the prosecution's motion, ruling 25 e-mails admissible and 26 e-mails inadmissible. As relevant here, the court ruled admissible Chris's e-mails to Aldover before or on June 4, 2010, that showed Chris's "then existing or a future intent" concerning his relationship with Shin, the future of 800 Exchange, and settlement of litigation; and e-mails on June 4, 2010. The court concluded these e-mails would refute Shin's suggestion resolution of issues between he and Chris were easily disposed of by the sale. The court explained the e-mails were relevant to prove Chris feared Shin would commit embezzlement and he wanted to protect his assets from Shin's creditors. The court opined the e-mails were "highly relevant to establish the unlikely quick settlement of their partnership on June 4[, 2010]." The court reasoned Chris's "on-going concerns, need for verification and desire for legal protection, all rebut the contention of this quick settlement." The court added some of the e-mails were admissible for the non-hearsay purpose to establish motive. The court engaged in the required Evidence Code section 352 balancing and concluded the e-mails were not unduly prejudicial. The court opined the evidence was sufficiently trustworthy based on other evidence regarding 800 Exchange's restructuring, settlement negotiations, and Chris and Shin's other business ventures. Finally, the court concluded the e-mails did not violate Shin's Sixth Amendment confrontation rights.

16

The trial court ruled the following two e-mails admissible without specifying the basis for admissibility. Based on the court's order, we conclude it admitted these e-mails pursuant to Evidence Code section 1250.

Chris to Aldover on June 3, 2010, at 5:36 p.m.—"[L]ets add in the metal reserve as well. Below is the approx[imate] details on it. Call it 'Metal Reserve.' *He has slacked in this for over [five] months and took it to the Wynn without my knowledge and we bought a safe with companies* [sic] *money for it but he still kept it out there this whole time*." (Italics added.) The e-mail stated the gold coins were worth $193,778.

Chris to Aldover on June 4, 2010, at 9:18 a.m.—"*I do not want a screen shot of the bank account. I want the correct user name/password so I can log on. That is what Shin knows, has known, and is* [sic] *not doing for the past [three] weeks so something is up*." (Italics added.)

The trial court ruled the following e-mail admissible and specified the basis for admissibility. It admitted the first italicized sentence pursuant to Evidence Code section 1250 and the second italicized sentence as non-hearsay.

Chris to Aldover on June 4, 2010, at 9:25 a.m.—"*We need to make sure he [Shin] doesn't have room for fraud. He is itching to do it again.* [¶] Also, we need all statements up to [sic] prior day of all activity in [bank] account given to us. It can be provided by the bank if needed *so [Shin] doesn't white out anything 'WHIH* [sic] *HE WILL TRY*'."[2]

---

[2] In its order, the trial court referenced paragraph three of Chris's June 4, 2010, e-mail written at 9:25 a.m., having Bates stamp No. 786. In the record before us, this e-mail has two paragraphs, the second containing Chris's statement Shin will try to white out bank statements. Based on the statement, and the court's ruling, we conclude the court was referring to paragraph two.

*B. Law*

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Hearsay evidence is generally inadmissible unless it satisfies a statutory exception. (Evid. Code, § 1200, subd. (b).)" (*People v. Turner* (2020) 10 Cal.5th 786, 821.) One such statutory exception is the state of mind exception. (Evid. Code, § 1250.)

Evidence Code section 1250, subdivision (a), states: "Subject to [Evidence Code] [s]ection 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." The statement must be trustworthy. (Evid. Code, § 1252.) A statement of memory or belief to prove the fact remembered or believed is inadmissible. (Evid. Code, § 1250, subd. (b).)

State of mind evidence may also be admitted for a non-hearsay purpose. Under this theory, state of mind evidence is a statement that does not directly declare a mental or emotional state but instead is circumstantial evidence of it and is not hearsay. (*People v. Clark* (2016) 63 Cal.4th 522, 590-591; *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 (*Ortiz*).) State of mind evidence admitted for a non-hearsay purpose must be relevant to an issue in dispute. (*People v. Riccardi* (2012) 54 Cal.4th 758, 814 (*Riccardi*), overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; Evid. Code, § 350.)

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

18

(Evid. Code, § 210.) "'While there is no universal test of relevancy, the general rule in criminal cases might be stated as whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense. [Citation.] Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury.' [Citation.]" (*People v. Freeman* (1994) 8 Cal.4th 450, 491.)

Additionally, the state of mind evidence must not be unduly prejudicial pursuant to Evidence Code section 352. (*Riccardi, supra,* 54 Cal.4th at pp. 824-825.) The evidence must not evoke an emotional bias against the defendant. (*People v. Crew* (2003) 31 Cal.4th 822, 840 (*Crew*).)

"The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence. [Citation.] This standard is particularly appropriate when, as here, the trial court's determination of admissibility involved questions of relevance, the state-of-mind exception to the hearsay rule, and undue prejudice. [Citation.] Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

C. Analysis

Shin argues the three e-mails were speculative and thus not relevant, unduly prejudicial, and untrustworthy. His contentions are meritless.

1. Merits

In general, a victim's out-of-court statements of fear of an accused are admissible under Evidence Code section 1250 only when the victim's conduct in conformity with that fear is in dispute. (*Riccardi, supra,* 54 Cal.4th at p. 816.) However,

19

"'[A] victim's prior statements of fear are not admissible to prove *the defendant's conduct or motive* (state of mind).'" (*Id*. at p. 817.)

*Riccardi, supra,* 54 Cal.4th 758, is instructive. In that case, our Supreme Court addressed the admissibility of a victim's statements describing her fear of defendant and her actions in conformity with that fear. (*Id*. at p. 815.) The court repeated the oft-stated rule, "Evidence that 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive' is generally admissible. [Citation.]" (*Id*. at p. 815.) The court concluded "evidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive—but only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it. [Citations.]" (*Id*. at p. 820.) The court explained "'evidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable.' [Citation.]" (*Id*. at p. 815.) The court added the declarant's statements must be trustworthy. (*Id*. at p. 821.)

The court explained state of mind evidence included two separate categories of evidence. (*Riccardi, supra,* 54 Cal.4th at p. 822.) The first category consisted of the victim's *direct* declarations of her state of mind and were offered for the truth of the matter asserted and were admissible (Evid. Code, § 1250) if relevant to a disputed issue in the case. (*Id*. at p. 822.) The second category consisted of the victim's *indirect* declarations of her state of mind and were not offered for the truth of the matter asserted but instead circumstantial evidence that engendered her fear or altered her conduct. (*Id*. at p. 823.) The court explained that to prevent the jury from considering the truth of non-hearsay state of mind evidence, the trial court could give the jury a limiting instruction on defendant's request. (*Id*. at pp. 824-825.) The court concluded, "Given the rules of relevancy, the trustworthiness requirements of Evidence Code section 1252, and the balancing required by Evidence Code section 352, we presume that trial

courts will appropriately screen the value of such evidence in light of the evidentiary problems that may stem from its admission."  (*Id.* at p. 825.)

Here, the prosecution had to prove Shin intended to kill Chris, made more difficult by the fact Chris's body had not been found, and Shin did so for financial gain. The prosecution's theory was that because Shin had to pay LGT $700,000 within five months or risk going to prison, Shin killed Chris so he would have sole control of their companies and he could use company assets to pay the restitution.

E-mails containing Chris's statements Shin was hiding their gold in Las Vegas, Shin had sole control of their bank account, and he feared Shin was going to commit fraud were direct evidence Chris was concerned Shin was planning to use company assets to pay the restitution.  These e-mails were relevant both to Chris's intent and Shin's motive.  Chris's demand for financial controls and transparency tended to establish his intent to remain in the company with Shin and rebutted the contention Chris sold his interest in the company to Shin.  Chris's fear Shin was going to use company assets to pay the restitution, and the measures Chris took to prevent Shin from doing so tended to establish Shin's motive to kill Chris before they executed an agreement to implement the measures.  In other words, with Chris gone, Shin retained sole control. Chris's statements logically, naturally, and by reasonable inference established Chris was intent on taking all necessary legal steps to protect himself from Shin's chicanery, and Shin's motive to kill him.  Contrary to Shin's claim, these were direct and indirect statements of Chris's state of mind and were relevant.

Chris's statement he wanted account statements directly from the bank because he feared Shin would "white out" information was an indirect declaration of his state of mind because it contained a description of Shin's conduct that engendered Chris's fear and altered his conduct, i.e., demanding financial controls and transparency. This statement was admissible for a non-hearsay purpose to the extent it was admitted as

21

circumstantial evidence to prove Chris's state of mind and conduct, and not to prove the truth of the matters asserted regarding Shin's conduct.

Shin contends Chris's statements were inadmissible because they were untrustworthy in large part because he "was no saint." (Evid. Code, § 1252.) "[A] declarant's statements 'must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness. Such declarations are admissible only when they are "'made at a time when there was no motive to deceive.'"' [Citations.]" (*Riccardi, supra,* 54 Cal.4th at p. 821.) Chris's statements included in e-mails to his attorney during ongoing settlement negotiations were made in a natural manner and not under suspicious circumstances. Additionally, Chris was not trying to deceive anyone. In a June 2, 2010, e-mail, Chris requested his demands for financial controls and transparency be included in the escrow instructions. Shin's assertion clients routinely lie to their lawyers, and his citations to numerous cases demonstrating instances of clients lying to their attorneys, does not establish the court abused its discretion by concluding Chris's statements to Aldover were trustworthy.

Shin asserts there was no evidence he knew of Chris's fears detailed in his e-mails to Aldover. To the contrary, there was sufficient foundational evidence that demonstrated Chris and Shin had been discussing Chris's demands for financial controls and transparency, and that Shin was aware of and participated in the negotiations between Dykstra and Aldover. (*Riccardi, supra,* 54 Cal.4th at p. 819 [ample foundational evidence of defendant's knowledge].) On April 6, 2010, Chris sent an e-mail to Aldover stating, "Here are the next steps we are going to put together on our end '[Shin and] myself' so I feel safe with many outstanding items before signing any settlement." Chris's e-mail detailed various measures to protect Chris's financial interest in 800 Exchange and S2, including an escrow account with specific instructions. On June 2, 2010, Aldover sent an e-mail to Chris concerning the timing of the settlement and asked Chris whether he and Shin resolved "the settlement funds/lock out from the"

22

800 Exchange bank account. Later the same day, Chris sent an e-mail to Aldover detailing the specific escrow instructions, including 800 Exchange bank statement activity and requesting that Shin must provide documentation to account for how he paid the settlement. On June 4, 2010, at 12:34 p.m., Chris sent an e-mail to Aldover stating he was "meeting with [Shin] now to go over statements." The fact Chris and Shin were reviewing and discussing financial matters was evidence Shin knew of Chris's concerns. The jury could reasonably rely on this evidence to conclude Shin was aware of Chris's state of mind before the crime and may have been motivated by it.

In *Riccardi, supra,* 54 Cal.4th at page 825, and earlier in *Ortiz, supra,* 38 Cal.App.4th at page 389, the courts stated the danger in admitting unduly prejudicial state of mind evidence is alleviated by the trial court's screening function. Here, the trial court performed its screening function and concluded the evidence was relevant and trustworthy. Additionally, the court conducted the Evidence Code section 352 balancing and concluded the evidence was not unduly prejudicial. Simply put, the three e-mails described above would not evoke an emotional bias against Shin. They did not involve any violent conduct that would cause the jury to prejudge Shin. The court conducted a conscientious review of approximately 50 e-mails and excluded about half of them.

Shin argues there was other evidence from which the jury could have reasonably inferred Chris feared Shin was going to embezzle from their companies. Perhaps, but he views the evidence after the fact. Pretrial, the trial court's duty was simply to determine whether the evidence was relevant, trustworthy, and not unduly prejudicial and allow each side to make the decision about the evidence they would introduce.

Shin contends the three e-mails were inadmissible beliefs used to prove the fact believed (Evid. Code, § 1250, subd. (b)), and were essentially inadmissible criminal propensity evidence (Evid. Code, § 1101, subd. (a)). For this to be true, the jury would have had to believe the truth of the e-mails. But the trial court instructed the jury with

23

CALCRIM No. 303, which stated the court admitted the e-mails to show Chris's state of mind and the jury could not consider the e-mails for their truth. We presume jurors are intelligent and capable of understanding and following the trial court's instructions. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 515 (*Mora and Rangel*).)

Finally, Shin's claim admission of the evidence violated his federal due process rights is meritless. As we explain above, the evidence was relevant, trustworthy, and not unduly prejudicial. (*Riccardi, supra,* 54 Cal.4th at p. 809 [routine and proper application of state evidentiary law does not violate defendant's due process rights].)

2. *Prejudice*

Assuming for the sake of argument the trial court did err by admitting the three e-mails, Shin was not prejudiced. The erroneous admission of evidence is evaluated under the reasonable probability standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836, which is a less onerous standard. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 886-887 (*Covarrubias*).) But we conclude any error here was harmless even under the more stringent reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

First, as we explain above, the trial court instructed the jury it could consider the e-mails only as to Chris's state of mind and not for their truth. "'Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 866-867.) The court's instruction thus prevented any prejudice. Additionally, we note the jury was aware of Shin's previous embezzlement from evidence independent of the e-mails.

24

Second, the evidence of Shin's guilt was overwhelming. It was undisputed Shin had to pay LGT $700,000[3] in restitution within five months or risk going to prison. Shin made $15,000 per month, plus possible profit distributions up to $20,000 every six weeks. With Chris gone, Shin's compensation would double. (*Crew, supra,* 31 Cal.4th at p. 851 [financial gain does not have to be exclusive or even primary motive].) Chris would not sign the LGT settlement without improved financial controls and transparency of their companies. On the day Chris disappeared, he told Aldover that he was meeting with Shin to review bank statements. 800 Exchange's bank statement from May 27 to June 28, 2010, showed several suspicious money transactions to another account. Chris expressed his concern Shin was "siphon[ing]" money from the company account. This was strong evidence Shin had a motive to kill Chris to avoid going to prison.

Within hours of killing Chris, Shin sent an e-mail and resolution to Aldover, while purporting to be Chris, stating Chris agreed to execute the LGT settlement and sell his interest in the company to Shin. Aldover thought it was "strange" because he and Chris had spent months finalizing the agreement with Shin to impose financial controls and transparency measures. Additionally, Shin closed the 800 Exchange office for one week to dispose of Chris's body and clean the blood soaked, stench filled office and when employees returned, he paid them large bonuses. Numerous people who saw Shin in the days after Chris's disappearance all said Shin did not suffer any visible injuries. These observations were inconsistent with the physical altercation Shin described as a basis for his self-defense theory. Additionally, from the brief time span between Shin stated he spoke with Chris to the time Shin e-mailed Aldover, the jury could reasonably infer Shin intended to kill Chris. Within about 90 minutes of Chris hitting his head, Shin sent an e-mail to Aldover detailing the division of assets and payments for their companies, and later that night a resolution detailing the settlement.

---

[3] There was evidence Shin already paid about $120,000.

From this evidence, the jury could conclude Shin acted calmly and rationally and evinces malice aforethought.

Days after Chris's disappearance, Shin rented a truck and drove to near the Mexican border and spent about an hour in a desolate area before returning home. Shin hired Kraft and let him live in Chris's apartment, drive Chris's vehicle, and dispose of Chris's belongings as he wished. For months, Shin used Chris's e-mail and instant messaging accounts to send Chris's family and friends messages he was traveling the world with a woman. When Paul or Steve questioned Shin about Chris, he continued to deceive them to conceal what he had done. Meanwhile, Shin paid his restitution in full. All of these acts suggest sophisticated planning, deception, and consciousness of guilt and rebut Shin's self-defense theory.

Shin cites to evidence Chris was stressed out, abused intoxicants, and had a temper to support his theory Chris was the aggressor. But there was other evidence Chris was happy, friendly, even-tempered, and professional. The jury heard all the evidence, including evidence of Shin's nearly yearlong plot to conceal Chris's death and rejected Shin's theory Chris was the aggressor.

Finally, Shin asserts the case turned on his credibility and claims the three e-mails undermined his credibility and the prosecutor's closing argument exploited the error. We agree with Shin this was a credibility case. Simply put, he had none. His conduct both on and after June 4, 2010, evinced a callous and depraved mind. Three e-mails expressing Chris's fear Shin would commit embezzlement did not "severely undermine[]" his credibility—they paled in comparison to the damning evidence he embezzled from LGT and devised and executed a sophisticated plot to conceal Chris's death for nearly a year. Shin's admission he was "battling against the odds in terms of credibility" is an understatement. The odds were insurmountable. Based on the trial court's limiting instruction and the above evidence, any error here was harmless beyond *all* reasonable doubt.

## II. Prosecutorial Misconduct

Shin contends the prosecutor committed numerous instances of misconduct when he cross-examined him. Shin provides the following four categories of misconduct and cites to numerous instances of alleged misconduct within each category: (1) assuming facts not in evidence and asking Shin to speculate (three instances concerning Steve's meeting with Shin and blood evidence); (2) improperly eliciting testimony to contradict or editorialize (six instances regarding Shin's screenshots of conversations with Chris, Shin's bank statements, Shin's safe deposit box, Shin's statements to police); (3) mischaracterizing Shin's testimony (two instances concerning Shin did not suffer any visible injuries and Shin's safe deposit box); and (4) appealing to the jury's passions (about 14 instances regarding Shin's cruel e-mails to Kloumann and Chris's family).

The Attorney General responds Shin forfeited appellate review of all his contentions except the first category—assuming facts not in evidence. Shin acknowledges he did not object to some of what he now claims was prosecutorial misconduct. He admits he lodged no objection on the grounds the prosecutor improperly appealed to the jury's passions, and he did not make a motion to strike, ask the trial court to admonish the jury, or request to go to sidebar to argue prosecutorial misconduct.

It is well settled a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion and on the same ground the defendant made an assignment of misconduct and requested the jury be admonished to disregard the impropriety. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) "'A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if "'an admonition would not have cured the harm caused by the misconduct.'" [Citation.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if "the court immediately overrules an

27

objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.'" [Citation.]" (*Ibid*.)

Here, Shin forfeited all but one of his contentions because he did not object at trial on the grounds he now asserts on appeal. On those nine instances where Shin's counsel made an objection the trial court overruled, they were on the following grounds not now asserted as misconduct: unstated objection; no question pending; hearsay; speculative; argumentative; relevance; asked and answered; and cumulative. The only alleged instance of misconduct that is preserved is one instance of alleged misconduct in the first category—assumes facts not in evidence.

Nothing in the record indicates an objection would have been futile. Indeed, on nine occasions the trial court sustained Shin's counsels' objections, albeit on different grounds now asserted as misconduct. With regard to those nine instances now alleged as misconduct where the trial court sustained Shin's counsels' objection, we discern Shin suffered no prejudice. (*People v. Dykes* (2009) 46 Cal.4th 731, 763 (*Dykes*) [where trial court sustained objection and witness did not answer, no prejudice].) Shin admits he did not request the court strike any testimony or admonish the jury.

Nor was the prosecutor's questioning so extreme or pervasive that a prompt objection and admonition would not have cured the harm. The trial court could have admonished the jury nothing the attorneys say is evidence (CALCRIM No. 222), it was the sole judge of the facts based on the evidence presented at trial (CALCRIM No. 200), and to not be swayed by sympathy (CALCRIM No. 200). We now turn to the one instance of alleged misconduct that is preserved for appellate review.

"""A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair

28

nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"" [Citation.]" (*Covarrubias, supra,* 1 Cal.5th at p. 894.)

"The prosecutor is entitled to attempt to impeach the credibility of a defendant's testimony [citation] and point out inconsistencies between his or her testimony and prior inconsistent statements. When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad. [Citations.]" (*Dykes, supra,* 46 Cal.4th at p. 764.) "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]. '"Whether the inferences the prosecutor draws are reasonable is for the jury to decide."' [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 133-134.)

Here, the prosecutor questioned Shin about disposing of Chris's body. Shin admitted Kaponen was his connection to the man that Shin hired to dispose of Chris's body. Shin also admitted that when he met Steve to discuss Chris's whereabouts, he gave Ramey's name to him. The prosecutor asked Shin whether he sent Steve an e-mail telling him about Kaponen. Shin did not remember, but when the prosecutor said the e-mail was in discovery, Shin agreed that if there was such an e-mail, he sent it. When the prosecutor asked Shin whether he gave Steve the name of the only person who knew how to contact the man who disposed of Chris's body, Shin answered, "Yes."

After Kloumann and Pestritto testified, the prosecutor resumed cross-examining Shin. The following colloquy occurred:

"[Prosecutor]: [W]hen we left off, we were talking about Steve . . . how he came looking for his son. [¶] Do you remember that?

"[Shin]: Yes.

[¶] . . . [¶]

29

"[Prosecutor]: . . . So the truth is . . . Kaponen sets you up with this Russian guy; right?

"[Shin]: Yes.

"[Prosecutor]: Okay. And . . . Kaponen is there for the link to the fact that there was a dead body inside the office, and it was Chris . . . ; right?

"[Shin]: I believe so, yes.

"[Prosecutor]: Well, you believe so or you know . . . ?

"[Shin]: Yes.

"[Prosecutor]: Okay. So of all the world, as we discussed before the break, you sent Steve . . . to the one person that could uncover the truth; is that right?

"[Shin]: I guess. I don't remember, but if --

"[Trial counsel]: I'll object, you honor. It's argumentative, assuming facts not in evidence.

"[Trial court]: Overruled.

"[Shin]: Yes.

"[Prosecutor]: Okay. I mean, did that give you some concern . . . that you got a guy who is a former police officer who's looking for his son, you've just given him the name of an actual person who was the one guy that could tell him I actually know what happened to your son? He was dead in the office. Weren't you worried about that?

"[Shin]: I obviously wasn't. No, I wasn't because I wasn't in the right frame of mind. If I was in the right frame of mind, I wouldn't have done that.

[¶] . . . [¶]

"[Prosecutor]: Okay. He let you know he was coming. This was an arranged meeting; right?

"[Shin]: Yes.

"[Prosecutor]: So you knew he was going to ask questions about what happened to his son; right?

"[Shin]: Yes.

"[Prosecutor]: And the truth that you're telling these people is that . . . Kaponen had the key to answering that question; right?

"[Shin]: Yes."

Contrary to Shin's claim, the prosecutor did not assume or state facts not in evidence. Before Kloumann and Pestritto testified, the prosecutor asked Shin about an e-mail he sent to Steve with Kaponen's name. Shin did not remember but agreed that if the e-mail existed, he sent it. Shin does not assert such an e-mail did not exist. When the prosecutor resumed cross-examining Shin, he inquired into Shin's thinking when telling Steve to contact Kaponen. Based on Shin's testimony before the break, the prosecutor did not assume facts not in evidence.

Additionally, even if Kaponen did not know Shin sought to dispose of Chris's body, he knew of and directed Shin to the man who would dispose of Chris's body. Thus, because Kaponen was the connection between Shin and the man that Shin claimed disposed of Chris's body, the prosecutor did not improperly suggest Kaponen could help Steve find Chris. Indeed, Shin admitted Kaponen was the only person who could reach the man who disposed of Chris's body. It was for the jury to decide whether the prosecutor's inferences were reasonable. For the same reasons, the prosecutor's questions were not argumentative. Assuming for the sake of argument there was prosecutorial misconduct, it was harmless beyond a reasonable doubt based on the evidence stated above in section I.C.2.

III. *Ineffective Assistance of Counsel*

Shin asserts his trial counsel, of which he had two, were ineffective if we conclude his prosecutorial misconduct claims are forfeited. We have concluded all but one of those claims are forfeited.

"To obtain relief, he 'must prove ""that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that

31

counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant.'"" [Citation.] A reasonable probability, the high court has said, 'is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*In re Champion* (2014) 58 Cal.4th 965, 1007.) "'[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' [Citation.]" (*Ibid.*)

Here, we need not decide whether Allan H. Stokke and Thomas E. Welbourn competently represented Shin at trial because any inadequacy did not prejudice Shin. It is not reasonably probable that but for counsel's failure to object to the alleged prosecutorial misconduct and request the court to admonish the jury, Shin would have obtained a more favorable result. We need not repeat all the evidence of Shin's guilt detailed above in section I.C.2. Simply put, it was overwhelming, and nothing the prosecutor said during his cross-examination of Shin undermines our confidence in the trial's outcome.

*IV. Cumulative Error*

Shin argues the substantial cumulative effect of the asserted errors requires reversal of his conviction even if none of the errors individually is prejudicial. Nonsense. This was not a close case concerning whether Shin intended to kill Chris for financial gain. Where we have assumed error, Shin was not prejudiced. Based on the overwhelming evidence of Shin's guilt, we conclude there was no substantial error and the cumulative effect of any possible errors does not warrant reversal of the judgment. (*People v. Jennings* (2010) 50 Cal.4th 616, 691.)

*V. Postverdict Proceedings*

Shin contends the trial court erred by denying his motion for a continuance and motion for new trial. Neither contention has merit.

*A. Background*

The jury returned its verdicts on December 7, 2018. The court set sentencing for February 1, 2019. The court continued the sentencing hearing four times. It is unclear from the record who made the first request. Shin requested the court continue sentencing twice, and the parties stipulated to the fourth continuance. The court set the sentencing hearing for July 26, 2019.

On July 3, 2019, Shin filed a motion for new trial based on newly discovered evidence that on May 16, 2017, Paul sold "several coins" to a jeweler for $13,069. The motion was supported by a purchase order from an Oregon coin shop and the store owner's declaration. The purchase order stated, "Silver" and underneath it stated 500 Philharmonics at $16.25 each and 320 Mexican Libertads at $15.45 each. Shin also filed a request to issue an out-of-state subpoena to secure Paul's attendance at the motion for new trial hearing. On July 9, 2019, the trial court signed a certificate of requesting judge asking an Oregon court to issue a subpoena to compel Paul's attendance at the hearing.

On July 24, 2019, Shin filed a motion to continue the hearing on the new trial motion and sentencing because he could not secure Paul's attendance at the hearing. Shin's counsel stated Paul refused to speak with them, he could not retain counsel in Oregon to file the order until July 22, 2019, and the matter could not be placed on calendar in Oregon until August 1, 2019.

At the hearing on July 26, 2019, when the trial court asked Shin's counsel when he discovered the new evidence, counsel responded December 2018. After stating it was July, the court stated due diligence was one of the factors to consider. Counsel argued the defense acted with due diligence and any further delay would be short. The

prosecution argued the new evidence would not change the result because the evidence at trial was overwhelming, and Chris's family was entitled to finality under Marsy's Law (Cal. Const., art. I, § 28, subd. (a)(6)). The trial court denied the motion for a continuance without explanation.

As to the new trial motion, Shin's counsel contended the prosecution relied heavily on the missing gold coins and implied Shin obtained the gold coins to prove financial gain. Counsel stated Paul sold "gold or coins or silver or whatever it may have been" to an Oregon coin shop. Counsel added the evidence showed Chris and Shin's gold coins were gone and "[n]ow we see that apparently a member of [Chris's] family did have those coins." When the court asked counsel what evidence it had to establish the coins Paul sold were Chris and Shin's gold coins, counsel replied, "We don't." Counsel contended the new evidence *implied* it was Paul, not Shin, who obtained Chris's gold coins. The prosecution argued Shin would not have had to steal even one of Chris's gold coins to still be convicted of murder for financial gain and based on the overwhelming evidence the new evidence would not change the verdict.

In ruling on the new trial motion, the trial court explained that in evaluating the merits, the fact Paul sold coins about seven years after Chris's death was an important factor when evaluating the five factors in ruling on a new trial motion. The court accepted the store shop owner's declaration as true. As to whether the evidence was newly discovered, the court stated, "The -- those facts speak for themselves as to whether it was discovered and what the import of it is." With respect to whether it was cumulative, the court stated, "There . . . is nothing to suggest many of the leaps that the court sees the defense making." The court mentioned but did not directly address due diligence before discussing whether a different result was probable and whether this was the best evidence of which the case admits.

The court explained the basis of the prosecution's case was Shin killed Chris to have sole control of their companies' assets. The court added the gold coins

34

were an interesting part of the case, "but [i]t [could not] remotely find that it was the strongest evidence introduced or that it was even a key piece of evidence introduced." The court added, "If we remove the aspect of gold coins from this, the evidence supporting the financial gain and the evidence of motive, and the need to pay back the restitution in the Riverside County case, and that deadline coming up were much stronger pieces of evidence and much stronger motive evidence than the gold coins." In support of its rationale, the court cited to *People v. Martinez* (1984) 36 Cal.3d 816 (*Martinez*), and *In re Wright* (1978) 78 Cal.App.3d 788 (*Wright*), a habeas corpus case it found "interesting and helpful." The court explained the evidence was merely impeachment evidence that was not significant enough to make a different result probable. Pursuant to Shin's counsel's request, the court sat as the 13th juror and affirmed the jury's verdict. The court denied Shin's motion for new trial.

*B. Law & Analysis*

*1. Motion to Continue*

Shin asserts the trial court's "summary denial" of his motion to continue to secure Paul's presence at the hearing on the new trial motion was an abuse of discretion and a denial of his right to due process, effective assistance of counsel, and a fair trial. Not so.

"The decision to continue a hearing so a party can secure the presence of a witness is one within the trial court's discretion. [Citation.] A trial court does not abuse its discretion in denying a continuance unless the defendant establishes good cause for a continuance. [Citation.] Good cause requires a defendant to show that he or she exercised due diligence in pursuing the witness's presence, the witness's expected testimony was material and not cumulative, the testimony could be obtained within a reasonable time, and the facts the witness would provide could not otherwise be proven. [Citation.]" (*People v. Caro* (2019) 7 Cal.5th 463, 499-500.)

35

"Under [Penal Code] section 1050, subdivision (e), '[a] "trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial. [Citation.] A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence." [Citation.] Such discretion "may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." [Citation.] "To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges." [Citation.]' [Citation.] '[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.' [Citations.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 934-935 (*Alexander*).) We find the answer in the circumstances of the case and the reasons counsel presented to the trial judge. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.)

Here, the trial court did not abuse its broad discretion by denying Shin's motion to continue. As the trial court observed, it had been seven months since the defense discovered the new evidence. Although the defense stated it had difficulty securing an Oregon attorney to handle the matter, the defense did not retain that attorney until four days before the hearing on the motion for new trial. Based on this, it was reasonable for the court to conclude Shin did not exercise due diligence in securing Paul's attendance at the new trial hearing. That only three weeks had passed since the trial court issued the out-of-state subpoena does not alter our conclusion when seven months had passed since the defense discovered the information.

Although the trial court did not provide its reasoning for denying the continuance and did not identify any detriment a continuance would cause, the prosecutor's argument and the court's extensive comments about the case suggest it carefully considered all pertinent circumstances. As we explain below more fully, Paul's testimony concerning he sold silver coins was not material evidence. Although the

36

prosecutor referred to gold coins at various times throughout the trial, the prosecution's primary theory to support the financial gain special circumstance was Shin gained sole control of the companies with Chris gone. At the hearing, Shin's counsel argued one could infer Paul possessed Chris and Shin's gold coins based on the fact Paul sold silver coins to an Oregon coin shop. On appeal, the parties disagree on the strength of that inference. We need not weigh in on that issue because irrespective of the missing gold coins, the fact Shin's salary and profit distributions doubled with Chris gone was substantial evidence Shin's motive for murder was financial gain. (*Crew, supra,* 31 Cal.4th at p. 851 [financial gain does not have to be exclusive or even primary motive].) In other words, even were Paul to testify about selling silver coins, there was no articulable benefit to Shin based on the overwhelming evidence detailed above. (*Mora and Rangel, supra,* 5 Cal.5th at p. 509 [trial court consider benefit expected and whether benefit expected will be realized].)

Finally, Paul refused to cooperate for seven months. It is doubtful a continuance for a few weeks would have secured his attendance. Thus, the court's denial of a continuance was not outside the bounds of reason and did not violate Shin's federal constitutional rights to due process, effective assistance of counsel, and a fair trial. (*Alexander, supra,* 49 Cal.4th at p. 935 [conclusion trial court did not abuse discretion forecloses federal claims].)

2. *Motion for New Trial*

Shin asserts the trial court erred by denying his motion for new trial, and because the court also denied his request for a continuance, the court essentially "refus[ed] to hear" the new trial motion. Again, his contentions are meritless.

"'"To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial." [Citation.] "[T]he trial court has broad discretion in ruling on a new trial motion . . . ," and its "ruling will be disturbed only for clear abuse of that discretion." [Citation.] In addition, "[w]e accept the trial

37

court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." [Citation.]' [Citation.] [¶] "'In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'"'" [Citation.]" (*People v. O'Malley* (2016) 62 Cal.4th 944, 1016-1017 (*O'Malley*); Pen. Code, § 1181.)

Shin cites to a 2007 Court of Appeal case for the proposition we review a trial court's denial of a new trial motion de novo. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224.) In that case, the court noted that in cases where the trial court denied a motion for new trial the applicable standard of review was unclear. (*Id.* at pp. 224-225, fn. 7.) Because that case implicated defendant's federal constitutional rights, the court reviewed the trial court's ruling de novo. However, in 2016, the California Supreme Court reviewed a trial court's denial of a motion for new trial for an abuse of discretion. (*O'Malley, supra,* 62 Cal.4th at pp. 1016-1017.) We will too.

Here, the trial court did not abuse its discretion when it denied Shin's new trial motion. We agree with the trial court the evidence at trial established Shin's motive for killing Chris was to gain sole control of their companies. Again, Shin's salary and profit distributions doubled with Chris gone. Although the prosecutor mentioned the gold coins at various times throughout the trial, and we surmise this evidence further increased the jury's interest in this already sensational case, the gold coins were not an integral part of the case. The description of the coins, silver, was inconsistent with Chris and Shin's gold coins, and this fact refutes Shin's suggestion the evidence would clarify Shin's intent and what actually occurred. Based on the overwhelming evidence described above, we are certain a different result on retrial was not probable.

38

Relying on the trial court's citation to *Wright, supra,* 78 Cal.App.3d 788, Shin claims the court erroneously applied a heightened standard. The trial court cited to the following statement from that case: "To warrant habeas corpus relief new evidence must be such as to undermine the entire structure of the case upon which the prosecution was based; it must point unerringly to the petitioner's innocence and must be conclusive; it is not sufficient that the new evidence conflicts with that presented at the trial and would have presented a more difficult question for the trier of fact. [Citations.]" (*Id.* at p. 802.) Needless to say, this is not a habeas case. However, the court clarified the case was "interesting and helpful," not that it was controlling. Additionally, the court cited to *Martinez, supra,* 36 Cal.3d 816, a case addressing a trial court's denial of a new trial motion. Finally, and most importantly, the court discussed the five factors that Shin agrees govern a trial court's evaluation of a new trial motion. The court applied the proper standard.

Shin acknowledges he had the burden of proof on his motion for new trial. However, he cites to *People v. Soojian* (2010) 190 Cal.App.4th 491, 521, for the proposition he met his burden "if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented." First, the *Soojian* court also stated, "our holding is necessarily limited to the procedural stance in which we find this case. (*Ibid.*) Second, based on the fact the jury deliberated for just two hours after an 18-day trial, we are certain not one juror would have voted to acquit had it heard the new evidence. Even if we reviewed the trial court's denial de novo, we would conclude the court did not err by denying Shin's motion for new trial.

Finally, relying on Penal Code section 1202, Shin argues the trial court effectively refused to hear his motion for new trial when it denied his motion for a continuance. Penal Code section 1202 provides in relevant part, "If the court shall refuse to hear a defendant's motion for a new trial or when made shall neglect to determine such motion before pronouncing judgment or the making of an order granting probation, then

39

the defendant shall be entitled to a new trial." *People v. Braxton* (2004) 34 Cal.4th 798 (*Braxton*), is the seminal case interpreting Penal Code section 1202 and is instructive.

In *Braxton, supra,* 34 Cal.4th at page 805, the court stated, "A reviewing court may order a new trial under [Penal Code] section 1202 only if the trial court's failure to hear the defendant's new trial motion has resulted in a miscarriage of justice [citation]." The court explained prejudice "will occur when, for example, the reviewing court properly determines from the record that the defendant's new trial motion was meritorious as a matter of law, or the record shows that the trial court would have granted the new trial motion and the reviewing court properly determines that the ruling would not have been an abuse of discretion. [Citation.]" (*Id.* at p. 817.) The court stated prejudice will not occur "when, for example, the record shows that the trial court would have denied the new trial motion and the reviewing court properly determines that the ruling would not have been an abuse of discretion, or the reviewing court properly determines as a matter of law that the motion lacked merit. [Citations.]" (*Id.* at p. 818.) Finally, the court stated there may be times when the record fails to answer whether a defendant was prejudiced. "[W]hen, as here, a trial court has refused to hear a defendant's new trial motion, and the appellate record is insufficient to permit a reviewing court to determine as a matter of law whether the proposed motion was meritorious, the reviewing court may remand the matter to the trial court for a belated hearing of the new trial motion, absent a showing that a fair hearing of the motion is no longer possible." (*Id.* at p. 819.)

Here, contrary to Shin's claim, the trial court heard, considered, and ruled on Shin's motion for new trial. As to whether the court's denial of his motion to continue hamstrung his motion for new trial, the record provides a definitive answer. The record before us is entirely clear and points unerringly to only one conclusion—as a matter of law Shin's motion for new trial lacked merit based on the overwhelming evidence Shin killed Chris for financial gain. Even if an investigation revealed Paul possessed gold

40

coins, or possessed Chris and Shin's gold coins, the result of the proceeding would not have been different when the evidence established that with Chris dead, Shin had sole control of their companies. Contrary to Shin's claim, the trial court's denial of Shin's motion to continue did not violate the spirit of Penal Code sections 1181 and 1202.

*3. Prejudice*

Even were we to conclude the trial court erred by denying Shin's motions to continue and new trial, and those denials implicated his federal constitutional rights, any error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. 18.) For the last time, there was overwhelming evidence of Shin's guilt. Without considering the missing gold coins, Shin stood to gain financially with Chris gone. His salary doubled to $30,000 per month and up to $40,000 in profit distributions every six weeks. Based on this evidence, the jury could reasonably conclude Shin did not act in self-defense but instead intended to kill Chris to gain sole control of their companies' assets to pay his restitution and avoid going to prison.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

41